Randall K. Rathbun #09765
Depew Gillen Rathbun & McInteer LC
8301 E. 21ˢᵗ Street, Suite 450
Wichita, KS  67206-2936
Telephone:  (316) 262-4000
randy@depewgillen.com

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| BYRON SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 06-3061-JTM-KGG |
| | ) | |
| GALLEGOS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BRIEF IN OPPOSITION TO MOTION TO DISMISS/MOTION
FOR SUMMARY JUDGMENT

This is the defendants' second bite of the apple.  There are three issues the Court

must address to rule on the defendants' second Motion to Dismiss/Motion for Summary

Judgment:

1.   **Did the Tenth Circuit get it right in reversing the prior dismissal of this
case?**  Mr. Smith was exposed to asbestos in a prison work detail over *eight*
years ago.  This case was filed almost six years ago.   The government has
never filed an answer.  There has never been a Rule 26(f) conference.  This
Court dismissed the case on July 25, 2007.  On March 31, 2009 the Tenth
Circuit, after giving due consideration to *Twombly,* reversed the dismissal
and sent the case back down for proceedings on the plaintiff's *Bivens*
claims.  Refusing to take no for an answer, the government quickly filed
another motion to dismiss, this time arguing that a dismissal is required
because *Iqbal* plowed new ground after *Twombly.*

2. **Do Mr. Smith's claims state a meritorious *Bivens* action?**  The Tenth Circuit held that Mr. Smith's complaint stated a cause of action for a constitutional violation of his Eighth Amendment rights under *Bivens.* Defendants recycle the arguments from their first motion to dismiss and again ask this Court to dismiss the claim.  The defendants knew of and disregarded an excessive risk to the health of Mr. Smith and, as such, are liable under *Bivens.*

3. **Are the defendants entitled to qualified immunity?**  Defendants claim they are entitled to a qualified immunity defense in this case.  The issue for the Court's consideration is whether the defendants' actions violated a clearly established statutory or constitutional right.  Three Circuits ruled–in the decade *prior* to the filing of this case–that inmates have a constitutional right not to be exposed to friable asbestos.  The argument is specious.

## I. Introduction and Background

Judge Brown recently reminded us of something that lawyers tend to overlook in our effort to steer a course between the rejection of heightened pleadings standards and the adoption of the plausibility standard in *Twombly/Iqbal*.  It is a simple lesson that we learned in law school but sometimes forget:

> The Federal Rules of Civil Procedure favor decisions on the merits rather than on the basis of technical pleading requirements.

*Johnson v. Sedgwick County Sheriff's Department*, 2009 U.S. Dist LEXIS 17839 (D. Kan 2009).

Mr. Smith was exposed to asbestos fibers through no fault of his own when he was sent to do a task in the United States Penitentiary in Leavenworth.  He was sent to work in a storage closet with friable asbestos present–a risk that the Penitentiary officials had been

warned of *nine years prior* to Smith's exposure.  Smith and his crew worked with asbestos thick in the air because another inmate had been sent to clean the closet in question.

As a result of his exposures, Smith will most likely find himself sitting in his physician's office one day, waiting to be told whether he has a death sentence called mesothelioma.  There is no cure or treatment for mesothelioma–all one can do is to wait and see when it develops.

The government, meanwhile, does its level best to avoid facing the merits of the case.  Smith's complaints have been met by successive motions to dismiss.  The Tenth Circuit rejected the defendants' first motion to dismiss and returned the case for proceedings on Mr. Smith's *Bivens* claim.  The defendants' response was to quickly file *another* motion to dismiss presently before the Court, suggesting that the Tenth Circuit's evaluation of the pleadings under *Twombly* is somehow ineffective because of the Supreme Court's decision in *Ashcroft v. Iqbal*, 129 S.Ct. 1937(2009) that followed several months later.  Make no mistake: the only effect of *Iqbal* on this case is to give the defendants another chance to attempt to delay proceedings in this matter and avoid discovery on the merits.

As was noted above, the exposure in this case happened over *eight* years ago.  The case was filed almost *six* years ago.   The government has never filed an answer.  There has never been a Rule 26(f) conference.  The plaintiff's very limited ability to do discovery in this case has been restricted to questions of qualified immunity.

3

The defendants' position should be rejected.  The Tenth Circuit has already ruled that Mr. Smith's pleadings state a claim under *Bivens*.  Accordingly, the issue before this Court is whether the defendants' motion for summary judgment should be granted before the defendants have answered and before there has been any meaningful discovery in the case on the merits.

## II.  TENTH CIRCUIT STATEMENT OF THE CASE

Following is the Tenth Circuit's description of the allegations contained in plaintiff's complaint from its opinion reversing the dismissal of this case:

"Smith's complaint stems from allegations that he was exposed to asbestos in 2003 while an inmate at Leavenworth. During his incarceration in Leavenworth, Smith worked as an electrician for the prison's Custodial Maintenance Services. Smith received a work order from his supervisor, defendant Jeffery Sinclair, to install a new light fixture in a closet in the prison's education department. Smith and others who were assigned to perform the installation were given access to the locked closet by defendant Janet Durbin, a staff member in the education department[1].  The closet lacked any ventilation.

While Smith was installing the light fixture, a fellow inmate, Carlos Gonzalez, entered the closet and asked to borrow some tools from Smith. Smith refused, consistent with prison policy, and Gonzalez then requested tools from Durbin, who provided them to

---

[1]Defendant Teresa Hartfield, the education administrator and Durbin's apparent supervisor, had to approve of all work or changes within the education department

4

Gonzalez. Gonzalez, who had been instructed by prison staff to clean the closet, then began pulling insulation off of the pipes in the closet, thereby filling the air with dust. Smith alleges that this dust contained asbestos, and the dust irritated his eyes, nose, and throat, and caused him to begin coughing.[2]  Durbin  directed Gonzalez to wait until the light fixture was installed before continuing his work in the closet. The work crew suspended work until the dust settled. The next day Smith was given another work pass by Sinclair, and he and the other members of the work crew returned to the closet to finish installing the light fixture. They were again given access to the closet by Durbin, and she again supervised their work. Gonzalez was allowed back into the closet while Smith and the others were working inside. Once inside, Gonzalez pulled insulation off pipes, releasing additional dust to which Smith was exposed. The dust again caused irritation to Smith, and the work crew again stopped working until the dust settled. Durbin directed Gonzalez to leave the closet, threatening to write a report on him if he did not comply. After the dust cleared, Smith and the crew continued work on the fixture, but could not get the light to work. Durbin called Sinclair, and he arrived to assist. The job was then completed.

In 1994, a survey was performed by the Ramsey-Schilling Consulting Group, documenting the presence of asbestos in "Building # 116" at Leavenworth and stating that the pipe insulation in the second floor education southwest storage room was damaged. Smith alleges the closet where he was exposed to dust in 2003 is in the education

---

[2]Attachments to Smith's original complaint also include an allegation by Smith that he had "developed white circles" on his lungs. [Aplt. App. Doc. 1 Exh. D1].

department of "Building # 116," and specifically alleges that this southwest storage room

is where he was exposed to asbestos. Smith contends that the pipe insulation that was

disturbed by Gonzalez was not in good repair, and that due to the pipe insulation's

damaged condition, asbestos was exposed to the air.

Smith alleged that the "safety [department at Leavenworth], CMS [Custodial

Maintenance Services at Leavenworth] and the education department knew that asbestos

was in the closet" due to the Ramsey-Schilling survey. [Aplt. App. Doc. 1 Attach. 4 at P

27]. Smith also references the response to his administrative remedy request which implies

that the warden at Leavenworth also knew of the asbestos as a result of the Ramsey-

Schilling survey. Smith further alleges that he was never given any warning regarding the

asbestos at any point. Smith claims that he suffers from a cough, shortness of breath, and

trouble with his throat and eyes. Smith also alleges emotional distress."  *See, Smith v.

U.S.A.*, 561 F.3d 1090, 1093-4 (10th Cir 2009).


### III. RESPONSE TO STATEMENT OF FACTS

### *Paragraphs 1 through 47*

1-47.   CONTROVERTED; the defendants purport to summarize the allegations

made in plaintiff's Second Amended Complaint (Doc. 110) in their "Concise Statement of

Material Facts" paragraphs 1-47.  (*See*, Doc. 122, pg 5-13.)

The Complaint speaks for itself and plaintiff objects to defendants' alleged summarization of the Complaint and the 42 exhibits attached thereto. As the Circuit noted in its opinion, *Smith v. United States*, 561 F.3d 1090 (10th Cir. 2009), in evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits, *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 964-65 (10th Cir. 1994), and documents incorporated into the complaint by reference, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007); *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1180 (10th Cir. 2007). "[T]he district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (internal quotation omitted).

The plaintiff objects to the defendants' half-hearted attempt to restate the plaintiff's claims. These are not the defendants' statements of uncontroverted facts as called for in FRCP Rule 56 to support a motion for summary judgment. Statements 1-47 are simply defendants' argument concerning the facts as the defendants read the plaintiff's second amended complaint.

### RESPONSE TO DEFENDANTS' "ADDITIONAL FACTS"

48.   Uncontroverted

49.   Uncontroverted

50.    Uncontroverted

51.    Uncontroverted

52.    Uncontroverted

53.    CONTROVERTED; Sinclair gave the plaintiff the work order to the storage closet in question.   [Exhibit 1 (Verified Second Amended Complaint) ¶ 2, p.5]

54.    CONTROVERTED; Sinclair gave the plaintiff the work order and work passes, also referred to as the job assignment.  Mr. Smith also had two other inmates with him, James Smith and James Armstrong.  The job assignment was to *install* a light fixture.

Defendant Sinclair argues that the work in question should have only taken 40 minutes.  Defendant, however, is a journeyman electrician and has been working in this field longer than the plaintiff.  The light fixture in question was being installed from scratch without the aid of power tools.  This required measurements to be taken, holes had to be made in the wall; the ballast had to be connected to the housing that houses the fluorescent lights; measurements had to be taken to bend the conduit; the conduit had to be bent, connected, and mounted; and the wire was run through the conduit.  The work was greatly delayed because while Smith and his crew were attempting to complete the job assignment, inmate Gonzales was pulling insulation off the two pipes trying to get to whatever was holding the pipes on the brackets.  This activity impaired the crew's vision and breathing due to the thickness of the dust being created in a very small area without any ventilation in a very tight working space. This caused Smith and the crew to stop

8

working and step out of the closet into the classroom area several times. The work crew also took time to go to lunch, coming back afterwards to continue working.  It, accordingly, took two days it took to complete the job.   [Exhibit 1, pg. 5, ¶ 5; Exhibit 2 (Smith affidavit), ¶3]

55.    CONTROVERTED; first it should be noted that the "possibility" that Sinclair gave work orders to the plaintiff in the previous paragraph has been replaced in this paragraph by the acknowledgment that Sinclair actually did give Mr. Smith the work orders in question.

Sinclair did assign Mr. Smith to an area with known friable asbestos.  The Ramsey-Schilling report confirmed asbestos on the pipes in the closet and warned the Leavenworth Penitentiary that the situation needed immediate attention. [See ¶¶ 138-140, *infra*.] Additionally, John Parent (CMS Manager) admits that he sent an e-mail to all personnel at the USP warning of the presence of asbestos in the Education Department after an inmate had done a rip and tear job on asbestos pipes in the December prior to Smith's exposure. [Exhibit 3; Exhibit 2, ¶7]

56.    Uncontroverted but irrelevant–no one can identify asbestos without a microscopic examination.  However, the Ramsey-Schilling report plainly warned the defendants that there was damaged, friable asbestos in the closet in question. [See ¶¶138-140, *infra*.]

57.     CONTROVERTED; Sinclair did allow the plaintiff into an area with known friable asbestos that he had been warned about shortly before Mr. Smith's exposure. [See Exhibit 3; Exhibit 2, ¶7]

58.     Uncontroverted

59.     CONTROVERTED; According to John Parent, he sent an e-mail to everyone warning them of the asbestos in the Education Building [Exhibit 3; Exhibit 2, ¶7]

60.     CONTROVERTED; Sinclair did assign plaintiff and his work crew into an area with damaged and friable asbestos and the plaintiff/work crew did not have personal protective equipment.  This happened a short time after John Parent had warned everyone about the asbestos in the Education Building. [Infra, ¶ 153]

61     Uncontroverted

62.     Uncontroverted

63.     Uncontroverted

64.     CONTROVERTED;  First, it should be noted that Parent does not deny the conduct Smith attributes to him–only that he does not "recall" it.  The plaintiff spoke with defendant Parent in his office in the presence of Electric Supervisor Richard Harris and explained to him how the incident occurred in 2003.  The plaintiff talked with defendant Parent and Richard Harris, and both told him to go over to medical and get checked for asbestos exposure. Defendant Parent told Smith in the presence of Richard Harris that he

wrote a memo to Education telling them not to let anyone into the back classroom area due to asbestos.  This e-mail was sent prior to Mr. Smith's exposure. [Exhibit 1, ¶19]

65.    CONTROVERTED; first, note that Parent does not deny that he told Smith about writing the memo in question–his response is that he does not recall doing so. In fact, Parent told Smith in the presence of Richard Harris that he wrote a memo to Education telling them not to let anyone into the back classroom area due to asbestos. Parent has admitted in FOIA requests that he drafted and sent such a memo [Exhibit 3; Exhibit 2, ¶7]

66.    CONTROVERTED; Inmate Dale R. Freland #04031-029, worked for Daniel Kell.  Freland witnessed the asbestos and witnessed Daniel Kell talking with administrator of CMS and Ms. Hartfield about the asbestos in Education working as a plumber. [Exhibit 4]

67.    Uncontroverted that Parent alleges that he had no knowledge of the asbestos in question.  CONTROVERTED as to whether this is true.  According to his declaration, Parents admits there are miles of asbestos containing material in the U.S.P. Leavenworth and that he is aware that friable asbestos can pose a health risk; that in 1994 Ramsey Schilling conducted an asbestos survey in the institution; and, that the Safety Department and Facilities Department continue to remove friable asbestos.  Additionally, Parent sent a e-mail out to everyone warning of friable asbestos after Gonzales did the rip and tear job in the janitor's closet in 12/2002. [Exhibit 3; Exhibit 2, ¶7]

11

68.    CONTROVERTED; Parent knew the Education Department's last classroom and closet contained friable asbestos. According to plaintiff's verified second amended complaint, several months after his exposure, plaintiff went with Richard Harris to John Parent's office.  Plaintiff told them about the exposure and asked John Parent for a copy of the work orders and work passes for installing the light fixture.  During this conversation John Parent stated in the presence of Richard Harris that prior to Plaintiff's being exposed to this asbestos he (John Parent) wrote a memorandum on his computer to everyone warning them of the friable asbestos in the Education Department. [Exhibit 1, ¶19]

69.    CONTROVERTED; the plaintiff is an inmate and he obviously worked in an area that was found in the Ramsey-Schilling Report to contain friable asbestos. [See ¶¶138-140, *infra*]

70.    Uncontroverted

71.    Uncontroverted

72.    Uncontroverted

73.    Uncontroverted

74.    CONTROVERTED; John Parent admits that he sent an e-mail to all personnel at the USP warning of the presence of asbestos in the Education Department after an inmate had done a rip and tear job on asbestos pipes in the December prior to Smith's exposure. [Exhibit 2, ¶7; Exhibit 3]

12

75. CONTROVERTED; Plaintiff actually told Howell that he had been exposed to asbestos. Smith had previously learned of the December 2002 incident involving Carlos Gonzales pulling asbestos insulation off pipes down the hall from the closet in question from Stephanie Wheeler, not from Howell. [Exhibit 1, ¶15]

76. CONTROVERTED; Howell became aware of the prior asbestos episode before Mr. Smith's exposure. He failed to take any steps to stop removal of asbestos by orderlies in the Education Building. The Ramsey Shilling report plainly indicated that there was 50 linear feet of asbestos covered pipe in the last classroom's storage closet at the other end of the hall. [See, ¶¶138-140, *infra*] He was also notified by Parent of the asbestos in the education department after Gonazales' rip and tear job in the janitor's closet in December 2002. [Exhibit 2, ¶7; Exhibit 3]

77. CONTROVERTED; the asbestos covered pipes in the classroom closet was damaged and friable and in a condition that required its removal/remediation. [See, ¶¶ 138-140, *infra*]

78. Uncontroverted

79. Uncontroverted that Howell so claims.

80. Uncontroverted that Wheeler told Mr. Smith about inmate Carlos Gonzoles pulling insulation off some more pipes in the Education Department just a few months prior to his exposure. She indicated that testing showed that the pipe covering was asbestos. [Exhibit 1, ¶15,27]

13

81.     Uncontroverted in part; Howell drafted the BP-229 to Smith Administrative claim.  In the response, Howell makes the following admissions:

>   (1)     The orderly was instructed to clean the storage closet. (This is the same orderly that several months earlier had done a "rip and tear" job on the asbestos in the janitor's closet at the other end of the hall);

>   (2)     He admits that the removal of the insulation around the pipe resulted in a possible exposure to asbestos;

>   (3)     He admits that the inmate orderly disturbed the insulation;

>   (4)     He admits that although there was no sampling prior to the remediation of the asbestos, the Ramsey-Schilling report confirmed the insulation was asbestos containing material.

CONTROVERTED as to the phantom third pipe issue.  There has never been a mention of a third pipe until 2005, long into this process when the defendants were attempting to get themselves out of the mess they had made.  The 50 linear foot of asbestos that the Ramsey-Schilling report tested and confirmed as asbestos in the closet in question were, of course, the two 25' long pipes running the full length of the closet.  There was no third pipe in the closet when plaintiff and his crew were working there.  There were no pipes at all after the remediation was completed after plaintiff's exposure. [Exhibit 2, ¶ 4]

82.     CONTROVERTED, the time period simply allowed the defendants to attempt to come up with a story to cover their conduct.

14

83.    CONTROVERTED; the two pipes were asbestos containing. [See, ¶¶138-140, *infra*]  The Armaflex argument did not come up until two years after the exposure–and eleven years after Ramsey had sampled the pipes and confirmed the ACM (asbestos containing material) covering on the pipes.  The same day that Howell came up with the Armaflex story, Neil Bustraan, a Votech Instructor informed Howell that in March 2003, he was a project representative for the Facilities Department and that the "asbestos in question" was removed by a contractor (Clean Air Environmental) under Bustraan's direction.  The ends were ragged and there was "insulation" on the floor.  The pipe were cut and wrapped into pieces and the floor was hepa vacuumed in accordance with asbestos regulations.   [Exhibit 5]

84.    Uncontroverted

85.    CONTROVERTED; it is uncontroverted that Smith was sent into a closet with damaged and friable asbestos pipe. [Exhibit 4; ¶ 138-9, *infra*]

86.    Uncontroverted

87.    Uncontroverted

88.    CONTROVERTED; John Parent admits that he sent an e-mail to all personnel at the USP warning of the presence of asbestos in the Education Department after an inmate had done a rip and tear job on asbestos pipes in the December prior to Smith's exposure. [Exhibit 3; Exhibit 2, ¶7]

89.    Uncontroverted

90.    CONTROVERTED to the extent the allegation is that Hartfield did not know that friable asbestos was dangerous prior to this lawsuit.  John Parent (CMS Manager) admits that he sent an e-mail to all personnel at the USP warning of the presence of asbestos in the Education Department after an inmate had done a rip and tear job on asbestos pipes in the December prior to Smith's exposure.  [Exhibit 3; Exhibit 2, ¶7]

91.    CONTROVERTED; John Parent (CMS Manager) admits that he sent an e-mail to all personnel at the USP warning of the presence of asbestos in the Education Department after an inmate had done a rip and tear job on asbestos pipes in the December prior to Smith's exposure.   [Exhibit 3; Exhibit 2, ¶7]

92.    CONTROVERTED;  Neil Bustraan warned Hartfield not to enter the closet and "at a minimum," not to allow inmates into the area. [Exhibit 5]

93.    CONTROVERTED; according to Dale Freland, head inmate plumber, Knell warned Hartfield on many different occasions that no one should be allowed into the contaminated areas and that before work could be done in the Education Building, the asbestos had to be removed. [Exhibit 4]

94.    Uncontroverted

95.    Uncontroverted

96.    Uncontroverted

97.    Uncontroverted

98.     CONTROVERTED; the Ramsey-Schilling report sets forth areas in the
Education Building that had friable asbestos present including the storage closet in
question.  Bustraan did not need to know the condition of the asbestos in the closet, it had
been disclosed in the plan, which had called for its immediate remediation nine years
earlier. [See, ¶¶ 138-140, *infra*]

99.     CONTROVERTED; on March 26, 2003, Clean Air Environmental of
Rossville, Kansas, sent a proposal to Bustraan to remediate eight different areas at USP
Leavenworth.  One of the projects was in the "VT Closet" where there was debris and pipe
on the floor. [Exhibit 6, pg. 000598] There were two pipes, both of which had been
previously on the wall as demonstrated by the picture taken by Ramsey-Schilling. [Exhibit
2, ¶ 4]  There was no third pipe in the closet when plaintiff and his crew were working
there.  There were no pipes at all after the remediation was completed after plaintiff's
exposure. [Exhibit 2, ¶ 5]

100.    CONTROVERTED; In March, 2003, when Smith was exposed to asbestos
in the storage closet, there were two pipes, both of which had been previously on the wall
as demonstrated by the picture taken by Ramsey-Schilling. [Exhibit 2, ¶ 4]  There was no
third pipe in the closet when plaintiff and his crew were working there.  There were no
pipes at all after the remediation was completed after plaintiff's exposure. [Exhibit 2, ¶ 4]

101.    CONTROVERTED; Bustraan knew that an inmate had entered a locked
janitor's closet on the other end of the floor only months prior to Mr. Smith's exposure and

did a rip and tear job, which lead to a warning from John Parent. Parent admits that he sent an e-mail to all personnel at the USP warning of the presence of asbestos in the Education Department after an inmate had done a rip and tear job on asbestos pipes in the December prior to Smith's exposure. [Exhibit 3; Exhibit 2, ¶7]

102.   CONTROVERTED; this is simply an after the fact fabrication by defendant to hide what actually occurred in the storage closet. The pipes in question were clearly ACM as they were tested by Ramsey-Schilling. Bustraan's recent claim that the pipes were insulated with Armaflex arises as a result of an attempt to defend this lawsuit. Armaflex is fiber free, duct free and does not particulate. It is a closed cell elastomeric product that is black in color and rubber in feel. On an indoor installation there would normally not be any covering on the foam. [Exhibit 2, ¶ 6]

103.   CONTROVERTED; the pipes in the closet were the ones pictured in the Ramsey-Schilling report. These pipes were insulated with ACM according to the report. These two pipes were the ones that Gonzales did the rip and tear job on when Mr Smith and his crew were working there.  [Exhibit 2, ¶ 4]

104.   CONTROVERTED; the phantom third pipe is a fabrication by defendants to attempt to cover up their conduct in this case. There were two pipes in the closet, both were insulated with ACM. The two pipes that ran the length of the closet (i.e., the 50 linear feet of asbestos pipe reference in the Ramsey-Schilling report) was the only piping in the closet. These were the pipes that Gonzales was doing the rip and tear job on while

18

Mr. Smith and his crew were attempting to do the work they had been ordered to do. [Exhibit 2, ¶¶4-7]

105.   Uncontroverted

106.   CONTROVERTED;  the Ramsey-Schilling report plainly disclosed the presence of friable asbestos – needing immediate attention – in the storage closet.  Mr. Smith and his crew was allowed to work there. [See, ¶¶ 138-140, *infra*]

107.   CONTROVERTED; the Ramsey-Schilling report plainly disclosed the presence of friable asbestos – needing immediate attention – in the storage closet. Nevertheless, Mr. Smith and his crew were allowed to work there. [See, ¶¶ 138-140, *infra*]

108.   Uncontroverted

109.   Uncontroverted

110.   Uncontroverted that Mr. Kell claims that he does not remember entering the closet in question.  He obviously does not deny entering the closet.

111.   Uncontroverted

112.   CONTROVERTED; Kell specifically acknowledges notifying Parent and Hartsfield about the asbestos in the janitor's closet in the Education Department in paragraph 114 of defendants' brief. [See, Doc. 22, pg. 27]

113.   Uncontroverted

114.   Uncontroverted that Kell had discussed with Parent and Hartfield the presence of asbestos on the same floor and in the same building as the asbestos that Mr.

Smith and his crew were exposed to.

115.    CONTROVERTED; the Second Amended Complaint is verified. [Exhibit 1,

¶ 19,27]

116.    Uncontroverted that the safety department has had a number of encounters

with asbestos prior to the plaintiff's exposure.

117.    CONTROVERTED; The purpose of the Report was to provide the

penitentiary staff with an asbestos assessment document which details the location,

quantity, types, conditions, response actions, and an operations and maintenance program

for all asbestos containing materials in the buildings which were selected to be surveyed.

[Exhibit 9, pg. 611]

118.    Uncontroverted

119.    Uncontroverted but irrelevant; on February 27, 1994, a sample of pipe

insulation was pulled for analysis from the room in question, described as a "Storage"

closet.  The insulation was describes as 50 linear feet (two pipes running the length of the

25' long closet).  The condition of the insulation was described as damaged and friable.

[Exhibit 9, pg. 2156] A picture of the pipe is attached as Exhibit 7.

120.    CONTROVERTED;  On February 27, 1994, a sample of pipe insulation was

pulled for analysis from the room in question, described as a "Storage" closet.  The

insulation was describes as 50 linear feet (two pipes running the length of the 25' long

closet).  The condition of the insulation was described as damaged and friable. [Exhibit 9,

20

pg. 2156] A picture of the pipe is attached as Exhibit 7.  Obviously, Howell is not

contending that the friable asbestos in the closet somehow improved in condition in the 9

years between the Report and the plaintiff's exposure.

121.   CONTROVERTED; this is a legal argument not a statement of fact.  Howell

was "generally familiar" with the report.  The purpose of the Plan was to provide the

penitentiary staff with an asbestos assessment document which details the location,

quantity, types, conditions, response actions, and an operations and maintenance program

for all asbestos containing materials in the buildings which were selected to be surveyed.

[Exhibit 9, pg. 611]

122.   Uncontroverted that the facilities and safety departments were aware of the

extreme hazards of friable asbestos and knew that they needed to post warning that such

areas were off limits until further notice.  It is uncontroverted that the storage closet had

not been properly posted with warnings.

123.   CONTROVERTED in part; the purpose of the Report was to provide the

penitentiary staff with an asbestos assessment document which details the location,

quantity, types, conditions, response actions, and an operations and maintenance program

for all asbestos containing materials in the buildings which were selected to be surveyed.

[Exhibit 9, pg. 611]

124.   CONTROVERTED and irrelevant; plaintiff does not allege that Howell

"needed to know" every location which may have friable asbestos present.  The Report

21

alerted the Safety and Facilities Departments that there was damaged and friable asbestos present in the closet that needed *immediate* attention in 1994–nine years before the plaintiff's exposure. [See, ¶¶ 138-140, *infra*]

125.    Uncontroverted that Parent was aware of the Ramsey-Schilling report. Plaintiff does not claim that Parent needed to be aware of every location in the Leavenworth Penitentiary that contained asbestos.

126.    Uncontroverted that Bustraan had general knowledge of the Ramsey-Schilling report.  Plaintiff does not claim that Bustraan needed to be aware of every location in the Leavenworth Penitentiary that contained asbestos.

127.    CONTROVERTED; Bustraan admits that he had general knowledge of the Ramsey-Schilling report.  The Report plainly disclosed damaged and friable asbestos on the two pipes in the closet and recommended *immediate* remediation.  He did not take the "necessary steps" to have it removed. [See, ¶¶ 138-140, *infra*]

128.    Uncontroverted but irrelevant; plaintiff does not claim that Wheeler needed to have "knowledge of all aspects" of the report.  She was aware of the report.  The report warned of the damaged and friable asbestos in the storage closet in question in 1994. [See, ¶¶ 138-140, *infra*]

129.    Uncontroverted

130.    Uncontroverted

131.    CONTROVERTED as to Hartfield's knowledge of asbestos in the facility.

After the Gonzales rip and tear job in the janitor's closet, and *prior* to Mr. Smith's

exposure, John Parent send out an e-mail to all staff warning about the presence of

asbestos in the Education Department. [Exhibit 3; Exhibit 2, ¶7]

132.    Uncontroverted

## IV. PLAINTIFF'S ADDITIONAL UNCONTROVERTED FACTS

### *The Ramsey-Schilling Report*

133.    Ramsey-Schilling Consulting Group conducted a comprehensive asbestos

survey and developed a management plan ("the Plan") for selected buildings for the

United States Penitentiary at Leavenworth, Kansas during the period of February-June,

1994. [Exhibit 9, pg. 611]

134.    The purpose of the Plan was to provide the penitentiary staff with an

asbestos assessment document which details the location, quantity, types, conditions,

response actions, and an operations and maintenance program for all asbestos containing

materials in the buildings which were selected to be surveyed. [Exhibit 9, pg.611]

135.    In 1994, the Plan disclosed that Asbestos was a "problem" for a number of

reasons, including the following: "Inhalation of asbestos fibers has been shown to cause

asbestosis, lung cancer and mesothelioma." [Exhibit 9, pg. 614]

136.    According to the Plan, one of the keys to an assessment of the asbestos

23

problems within a building is the determination of the exposure potential of asbestos-containing materials with respect to the area the ACM occupies. [Exhibit 9, pg. 618]

137.   When suspect ACM (asbestos-containing material) was identified, Ramsey-Schilling obtained sufficient bulk samples to characterize each systems material or area. All samples were obtained by an EPA-AHERA Accredited Asbestos Inspector.  Samples in the sealed and labeled sample containers were transferred to an asbestos laboratory under strict chain of custody procedures. [Exhibit 9, pg. 617]

138.   On February 27, 1994, a sample of pipe insulation was pulled for analysis from the room in question, described as a "Storage" closet.  The insulation was describes as 50 linear feet (two pipes running the length of the 25' long closet).  The condition of the insulation was described as damaged and friable. [Exhibit 9, pg. 2156] A picture of the pipe is attached as Exhibit 7.

139.   The consultant submitted the sample from the storage closet for analysis for the presence of asbestos by use of polarized light microscopy.  The results showed that the insulation was 43% asbestos, with a composition of chrysotile fibers (8%) and amosite fibers (35%). [Exhibit 9, pg. 2170]

140.   Ramsey-Schilling described the hazard ranking assessment of the ACM pipe insulation in question as a level 2. [Exhibit 9, pg. 2129]   According to the Plan, ACM with a hazard assessment ranking of 2 required *immediate* repair/O & M (Operations & Maintenance Program):

24

"ACM is generally friable and damaged, causing an immediate
health hazard, but has a low potential for future disturbance. The
damaged portion of the ACM should be removed prior to repairing
the ACM. The source causing the damage should be eliminated if
possible. An 0 & M Program should be implemented in the interim
if repair of ACM can not be completed immediately. ACM should be
periodically reinspected to ensure no damage has occurred to the ACM.
Details of a proper 0 & M Program are included in the  Operations
and Maintenance Program section of this report.

[Exhibit 9, pg. 621]


### *Mr. Smith's exposure*

141.    Mr. Smith worked as an electrician within the United States Penitentiary at

Leavenworth in the Custodial Maintenance Services ("CMS"), from July 23, 2002, until

August 19,2003.  His supervisors during his employment with CMS were Richard Harris

and Jeffrey Sinclair.   [Exhibit 8, ¶ 1,2]

142.    In approximately March 2003, Mr. Smith and the crew he worked with were

sent to the Education Department to install an additional light fixture in the southwest

storage closet. [Exhibit 8, ¶ 3; Exhibit 2, ¶2]

143.    Sinclair gave the plaintiff the work order and work passes, also referred to as

the job assignment.  Mr. Smith also had two other inmates with him, James Smith and

James Armstrong. [Exhibit 1, pg. 5, ¶5]

Defendant Sinclair claims that the work in question should have only taken 40

minutes.  Defendant, however, is a journeyman electrician and has been working in this

field longer than the plaintiff. The light fixture in question was being installed from scratch without the aid of power tools. This required measurements to be taken, holes had to be made in the wall; the ballast had to be connected to the housing that houses the fluorescent lights; measurements had to be taken to bend the conduit; the conduit had to be bent, connected, and mounted; and the wire was run through the conduit. [Exhibit 2, ¶3]

144.   When Smith and his work crew arrived at the Education Department, they were met by former Leavenworth staff member Janet Durbin. This is also the individual who submitted the work order to CMS to install the additional light fixture. Defendant Durbin brought Smith and his crew to the southwest storage closet and showed them where to install the additional light fixture [Exhibit 8, ¶ 4]

145.   When Mr. Smith entered the closet to start the work he noticed two insulated disconnected pipes running the length of the closet along the bottom of the wall. The pipes were identical in appearance to the picture taken of them by the Ramsey-Schilling Consulting Group in 1994, attached hereto as Exhibit 7. [Exhibit 8, ¶5; Exhibit 2, ¶4]

146.   At the same time the plaintiff and his crew were installing the light fixture, another staff sent inmate Carlos Gonzales into this same closet and ordered him to clean it out. While Mr. Smith and his crew were working, inmate Gonzales began pulling the insulation off of the insulated pipes, causing the air in the closet to become thick with dust from the insulation. The dust was so thick that Durbin, Smith and his crew and even inmate Gonzales had to leave the closet and step into the adjoining classroom until the dust

26

settled.  The dust caused great irritation to the plaintiff's eyes, throat, and breathing.

[Exhibit 8, ¶6-7]

147.   There were no signs posted to inform worker, or, anyone else, that the two pipes were insulated with asbestos.  As a result, Smith and the others in the storage closet were exposed to airborne asbestos fibers. [Exhibit 8, ¶10]

148.   About a month or so after Smith's asbestos exposure he had the occasion to be in the Education Department again.  At that time, Smith noticed that there was a sign posted on the classroom wherein the southwest storage closet is located. The sign stated that the area was off limits to both inmates and staff until further notice.  After affiant read the notice he became curious as to why the area would be placed off limits, and, therefore began to investigate the matter. [Exhibit 8, ¶11-12]

149.   Smith went to the Safety Department and spoke to Stephanie Wheeler (Safety Officer) asking her about the sign posted on the door in the Education Department and asked her whether there was asbestos within the southwest storage closet.  Ms. Wheeler stated that there was no asbestos in the closet and that she did not know who put the sign on the classroom door. [Exhibit 8, ¶13]

150.   Several months after his exposure, plaintiff went with Richard Harris to John Parent's office.  Plaintiff told them about the exposure and asked John Parent for a copy of the work orders and work passes for installing the light fixture.  During this conversation John Parent stated in the presence of Richard Harris that prior to plaintiff's being exposed

27

to this asbestos he (John Parent) wrote a memorandum on his computer to Teresa Hartfield warning her to tell her staff not to let anyone into the last classroom and closet due to damaged asbestos insulation. [Exhibit 1, pg. 9, ¶19].

151.   Sometime in late 2003 or early 2004, Mr. Smith asked Mitchell Malone to accompany him from the Leisure Library to the closet in question under the guise of looking for cardboard to use in making a game.  Smith could not believe the condition of the closet when they arrived there.  The closet was extremely clean and the floor looked like it had been waxed.  The two pipes were gone. [Exhibit 2, ¶5 ]

152.   On January 8, 2004, Mr. Smith went to medical to be seen and tested by Dr. Tharp for his suspected asbestos exposure.  Smith recounted the exposure incident to Dr. Tharp.   After Dr. Tharp gave Smith a copy of her notes, Smith noted that she had made a factual error concerning who had pulled the insulation off the pipes.  Dr. Tharp made the correction to her notes and also checked with the Safety Department.  She made the following notes in Mr. Smith's chart:

> "Mr. Smith–I will make a separate note indicating correction. Thanks.  Also, I did call Safety and was told that they remembered the incident very well and have done the appropriate investigation; (yes, asbestos was confirmed)."

[Exhibit 8, ¶¶18-20]

### *Knowledge of Asbestos in the Education Building*

152.   According to Dale Freland, head inmate plumber, Knell warned Hartfield on many different occasions that no one should be allowed into the contaminated areas and

that before work could be done in the Education Building, the asbestos had to be removed. [Exhibit 4]

153.    Plaintiff learned after his exposure that in December, 2002, inmate Gonzales–the *same* inmate that did the rip and tear job in the the storage closet–had done the very same thing in a janitor's closet on the same floor.  After the incident, and *prior* to Mr. Smith's exposure. John Parent send out an e-mail to all staff warning about the presence of asbestos in the Education Department. [Exhibit 3; Exhibit 2, ¶6]

## V. ARGUMENT AND AUTHORITY

### A.  Iqbal has no effect on the Circuit's decision in this matter.

The Tenth Circuit has already ruled that the plaintiff's pro se amended complaint[3] survived the defendants' Rule 12(b)(6) motion to dismiss.  The Court's analysis was based upon a *Twombly* evaluation of plausibility.  That decision was handed down on March 31, 2009.

*Ashcroft v. Iqbal*, 129 S.Ct 1937 (2009) was decided by the Supreme Court several months later.  The essence of the Court's ruling in *Iqbal* is that the pleading standard announced in *Twombly* is not limited to antitrust actions.  Contrary to defendants' claim, they did not plow new ground that was not already established by *Twombly* and utilized by the Circuit in its analysis of Mr. Smith's pro se pleadings.

_____

[3]The Second Amended Complaint was drafted by Mr. Smith prior to the appointment of the undersigned by the Honorable Don Bostwick on December 30, 2009 (Doc. 117).

The defendants argue that under *Iqbal*, a plaintiff cannot rely on general, conclusory allegations to survive a motion to dismiss and that a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face. (*See*, Doc. 122 at 33)   However this was not a new standard that arose from *Iqbal*–indeed, the Court in *Iqbal* specifically cites *Twombly* for this language.  *Id.* at 1949.

Again, to make it appear that the Court in *Iqbal* plowed new ground, the defendants refer to the two-prong approach used in *Iqbal* for evaluating a complaint.  *Id.* at 1950.  However when one refers to the precise language in *Iqbal*, it credits the *Twombly* decision for the two-pronged approach ("Our decision in *Twombly* illustrates the two-pronged approach" *Id*. at 1950).

Finally, the defendants refer to *Iqbal* for the proposition that a complaint must set forth "more than an unadorned, the defendant-unlawfully harmed me accusation" Not surprisingly, the quoted language comes from *Twombly*.  *Id.* at 1949.

In short, *Iqbal* sheds no new light on the Supreme Court's analysis under *Twombly*–other than to confirm that the standard applied to all cases and not simply antitrust litigation.

### B.  The Amended Complaint States a Viable Constitutional Violation.

The defendants claim this *Bivens* action must be dismissed because the plaintiff has failed to state a viable constitutional violation by the federal defendants.  This argument

was carefully examined by the Court of Appeals in its decision, *Smith,* at 1103-1106.

Defendants ignore the Circuit's analysis of the facts, apparently somehow concluding that

this Court will not note that the Tenth Circuit has already disposed of their arguments.

As the Tenth Circuit observed, to state a *Bivens* Eighth Amendment claim, "Smith

had to allege that each defendant official acted with deliberate indifference–that he or she

both knew of and disregarded an excessive risk to inmate health or safety." *Id.* at 1104.

The official must be both aware of facts from which inferences could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference. *Id.* at 1105.

Defendants start behind the eight ball in their argument concerning the issue of

whether an excessive risk actually existed.  Three different circuits have reviewed the

issue of inmate exposure to asbestos and all have taken positions that are contrary to the

one  being suggested by the defendants.  In *Powell v. Lennon*, 914 F.2d 1459 (11th Cir

1990), the Eleventh Circuit reversed the District Court dismissal of the plaintiff inmate's

*Bivens* action arising out of exposure to asbestos.  Powell involved a claim by a inmate

that he was forced to remain in a dormitory which, prior to his arrival, had been

contaminated with friable asbestos which had never been properly remediated.  The inmate

also alleged that the defendants knew of the danger and refused to move him to an

asbestos free environment.  The Court of Appeals found that the allegations stated a claim

under  *Bivens* and that the defendants were not entitled to qualified immunity.

31

Five years later the Ninth Circuit reviewed a §1983 claim against prison officials

arising out of an inmate's exposure to asbestos in a work detail.  In *Wallis v. Baldwin*, 70

F.3d 1074 (9th Cir. 1995), an inmate filed a claim against prison officials alleging a

violation of the Eighth Amendment.  The Court first examined whether the deprivation

suffered was, objectively speaking, sufficiently serious.  The Court spent little time in so

concluding:

> It is uncontroverted that asbestos poses a serious risk to human
> health. *See, e.g.*, 20 U.S.C. §§ 3601(a)(3), 4011(a)(3) (noting the
> Congressional finding that medical science has not established any
> minimum level of exposure to asbestos considered safe). Wallis'
> medical expert declared that forty-five hours of unprotected exposure
> to asbestos is medically serious. Therefore, the critical question before
> the district court was whether the defendants acted with "deliberate
> indifference" in exposing Wallis to the asbestos in the EOCI attics. *Helling
> v. McKinney,* 509 U.S. , 125 L. Ed. 2d 22, 113 S. Ct. 2475, 2480 (1993)
> (quoting *Estelle v. Gamble,* 429 U.S. 97, 104, 50 L. Ed. 2d 251, 97 S. Ct.
> 285 (1976)).

In addition the Court noted that asbestos is a well-known and highly publicized

carcinogen.   The evidence showed that Wallis had worked in a prison work detail for two

weeks cleaning attics.  The attics housed pipes covered with asbestos containing material,

some of which had been damaged.  The crew had been ordered to tear off the loose pipe

covering and bag it for disposal–all without respiratory protection.  The work crew spent

45 hours cleaning the attics.  The decision is silent as to how many hours of exposure

Wallis actually had during the time spent in the attic. On appeal, the defendants argued

that they had no knowledge of the existence of the asbestos prior to the crew beginning

work in the attic.  The Court rejected the argument, finding that the evidence showed that they suspected the existence of exposed asbestos which created an obligation to inspect the attics before sending the inmates to work there.

Finally, the defendants cite a Seventh Circuit decision which they claim supports their legal position.  A careful reading of the case, however, demonstrates to the contrary. *McNeil v. Lane,* 16 F.3d 123 (7th Cir. 1993) involved an Eighth Amendment claim arising out of an alleged exposure to asbestos.  The inmate alleged that asbestos covered pipes existed outside his cell.  The Court rejected the claim, noting that asbestos covered pipes are ubiquitous[4].  The Court also noted, referencing *Powell*, *supra*: "Had McNeil been forced to stay in a dormitory where friable asbestos filled the air, we might agree that he stated a claim under the Eighth Amendment."  *Id.* at 125.

Mr. Smith was exposed to friable asbestos.  The Circuits are in agreement that such exposure constitutes an Eighth Amendment violation.  There is no safe level of exposure to friable asbestos.  Byron Smith was clearly exposed to "an excessive risk to inmate health or safety."

### *The Subjective Requirement of a Bevins Claim*

The Tenth Circuit also ruled that on the basis of the facts pleaded, Mr. Smith's complaint met the subjective requirement of the deliberate indifference test.  By way of background, Judge Briscoe noted in her opinion that: "[T]he official must both be aware of

---

[4]Indeed the currently favored remediation technique for non-friable asbestos is to leave it in place.

facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Smith* at 1105.  This means that the plaintiff must allege that the defendants "both knew of and disregarded an excessive risk to inmate health or safety." *Id.* at 1104.

The Tenth Circuit then carefully examined the pleadings and concluded that Mr. Smith had successfully pleaded a *Bivens* cause of action against the individual defendants with the exception of the Attorney General of the United States and H. Lappin, the director of the Federal Bureau of Prisons.  The Court examined the pleadings and noted that as to each there was sufficient knowledge of the presence of asbestos in the closet in question. The Court held that the defendants "are on fair notice of who is alleged to have done what to whom." *Id.* at 1105.

Because of the defendant's claim of qualified immunity, the plaintiff has been allowed very limited discovery to respond to the defendant's motion.  However, the following facts are now uncontroverted and must be examined in a light most favorable to the Mr. Smith:

(1)  In 1994, the Ramsey Schilling report warned the Penitentiary that friable asbestos was present in the closet in question and that it needed to be addressed immediately.  Penitentiary officials did nothing.

(2)  Several months prior to the plaintiff's exposure to asbestos in the Education Building, an inmate orderly did a rip and tear job on asbestos covered piping in the *same building* in a closet on the *same floor*.  The inmate's rip and tear job disturbed asbestos in that closet which required a remediation.

34

(3)     After the previous rip and tear job, an e-mail was sent to all personnel at USP Leavenworth warning of the asbestos present in the education building. All defendants had been placed on notice that asbestos would be encountered in the Education Building.

The defendants have adopted what charitably might be referred to as the ostrich defense, i.e., they claim their heads were buried in the sand and that they did not receive the warning sent them.  They argue that they somehow were not aware of this dangerous risk.  The Tenth Circuit has ruled, however, that protestations of ignorance of a danger is not outcome determinative.   As the Court noted in *Despain v. Uphoff*, 264 F.3d 965 (10th Cir, 2001), whether an official has "the requisite knowledge of a substantial risk" and ignored that risk is a question of fact. *Farmer*, 511 U.S. at 842. Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence. *Id*.; *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 809-10 (10th Cir. 1999). Although, in general "it is not enough to establish that the official *should* have known of the risk of harm," *Barney*, 143 F.3d at 1310 (emphasis added), in some cases "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," *Farmer*, 511 U.S. at 842.

A plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate," as long as the official should have understood the possibility that harm might ensue. *Farmer*, at 842. The test requires both knowledge and disregard of possible risks, a *mens rea* on a par with criminal recklessness. *Farmer*, at 836. If an official is

35

aware of the potential for harm but takes reasonable efforts to avoid or alleviate that harm, he bears no liability under this standard. *Farmer*, at 844; *MacKay v. Farnsworth*, 48 F.3d 491, 493 (10th Cir. 1995).

The plaintiff has shown that, shortly before his exposure, all defendants were warned about the asbestos in question.  They know of the excessive risk and did nothing.


C.  ***The Defendants are not Entitled to Qualified Immunity***

Defendants also claim that they are entitled to qualified immunity, arguing that there was no clearly established right at the time this cause of action arose to be free from exposure to asbestos.  This argument was examined and rejected in an inmate asbestos exposure complaint by the Eleventh Circuit almost twenty years ago:

> The defendants assert that they are entitled to qualified immunity for their actions in exposing the plaintiff to asbestos. In order to defeat a claim of qualified immunity, a plaintiff must show that the right allegedly violated was clearly established and that the contours of the right were sufficiently clear that a reasonable officer would have  understood that his actions violated that right. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987). The plaintiff need not, however, point to a prior case holding the very action in question to be unlawful; the unlawfulness merely must be apparent in light of pre-existing law.
>
>         \*       \*       \*       \*
>
> It is clearly established that prison officials who show deliberate indifference to an inmate's serious medical needs violate the Eighth Amendment. *Estelle*, 429 U.S. at 104-05, 97 S. Ct. at 291. In the present case, the plaintiff informed prison officials that exposure to friable asbestos threatened his life and health. The plaintiff's demand to be placed in an asbestos-free environment constituted a serious medical need, and the defendants' actions in ignoring his request constituted deliberate indifference. Certainly the

36

> unlawfulness of these actions should have been apparent to the defendants in light of *Estelle. See Anderson*, 483 U.S. at 640, 107 S. Ct. at 3039. Accordingly, the defendants are not entitled to qualified immunity.

As the Ninth Circuit observed in Wallis, *supra*, the Oregon state legislature has established a policy declaring that asbestos is a human carcinogen and there is no known safe level for human exposure to asbestos. As Judge Van Bebber noted almost 20 years ago, "In 20 U.S.C.§ 4011(a)(1), Congress made an express finding that "medical science has not established any minimum level of exposure to asbestos fibers which is considered to be safe to individuals exposed to the fibers." *U.S.A. v. A.A. Mactal Construction Co.*, 1992 U.S. Dist LEXIS 21790 (D. Kan 1992).

There is no safe level of exposure to friable asbestos. Defendants hope to create a false dilemma with this Court. Their argument is akin to arguing that a prior decision recognizing a constitutional violation in which an inmate is beat for five minutes does not give clear guidance to a federal official who beats an inmate for only three. There is *no* safe level of exposure to friable asbestos and no court has ever found that there is.


## IV. CONCLUSION

The plaintiff has long awaited his day in court. Because of the defendants' questionable qualified immunity claim, the plaintiff has been afforded almost no discovery. This limited discovery has clearly demonstrated a shockingly cavalier attitude toward one of the most carcinogenic substances known to man. Byron Smith does not

have a spotlessly clean record–but he deserves better than this.  The ticking time bomb in

his chest was placed there by federal officials would knew the risk and did nothing.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER LC


s/Randall K. Rathbun_____
Randall K. Rathbun #09765
8301 E. 21st Street N., Suite 450
Wichita, KS 67206-2936
Telephone: (316) 262-4000
Fax: (316) 265-3819
Email: randy@depewgillen.com
*Attorneys for Plaintiff Smith*

CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of December, 2011, a true and correct copy of

the above and foregoing **Brief in Opposition to Motion to Dismiss/Motion for**

**Summary Judgment** was filed with the US District Court for the District of Kansas via

CM/ECF and notice sent to:

>Andrea L. Taylor
>Assistant United States Attorney
>500 State Avenue, Suite 360
>Kansas City, KS 66101
>*Attorney for Defendants*


>s/Randall K. Rathbun
>Randall K. Rathbun